RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 12a0353p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

PLANNED PARENTHOOD SOUTHWEST OHIO
REGION; PLANNED PARENTHOOD OF CENTRAL
OHIO; PLANNED PARENTHOOD OF
NORTHEAST OHIO; TIMOTHY KRESS; LASZLO
SOGOR; PRETERM,

    *Plaintiffs-Appellants*,

*v.*

MIKE DEWINE, Attorney General of Ohio;
JOSEPH DETERS,

    *Defendants-Appellees*.

No. 11-4062

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:04-cv-493—Susan J. Dlott, Chief District Judge.

Argued: June 7, 2012

Decided and Filed: October 2, 2012

Before: MOORE, ROGERS, and McKEAGUE, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** B. Jessie Hill, CASE WESTERN RESERVE UNIVERSITY SCHOOL OF LAW, Cleveland, Ohio, for Appellants. Jeannine R. Lesperance, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellees. **ON BRIEF:** B. Jessie Hill, CASE WESTERN RESERVE UNIVERSITY SCHOOL OF LAW, Cleveland, Ohio, Helene T. Krasnoff, PLANNED PARENTHOOD FEDERATION OF AMERICA, Washington, D.C., Roger K. Evans, PLANNED PARENTHOOD FEDERATION OF AMERICA, New York, New York, Alphonse A. Gerhardstein, GERHARDSTEIN & BRANCH CO. LPA, Cincinnati, Ohio, Carrie L. Davis, for Appellants. Jeannine R. Lesperance, Erick D. Gale, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellees. Mailee R. Smith, AMERICANS UNITED FOR LIFE, Washington, D.C., for Amici Curiae.

1

MOORE, J., delivered the opinion of the court in which, ROGERS and McKEAGUE, JJ., joined in Parts I–V.  MOORE, J. (pp. 23–32), delivered a separate Part VI, which dissents in part from the separate majority opinion delivered by McKEAGUE, J. (pp. 33–39), with which, ROGERS, J., concurs.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge.    In 2004, Ohio passed a law criminalizing the distribution of mifepristone, also known as RU-486, unless the distribution mirrored certain protocols and gestational time limits identified by the FDA when mifepristone was first approved in 2000.  Ohio Rev. Code § 2919.123 (the "Act").  Mifepristone, in combination with misoprostol, was the only form of medical abortion offered by Planned Parenthood in Ohio.  Planned Parenthood's Ohio regional clinics and two of its doctors (collectively, "Planned Parenthood") brought suit shortly after the Act's passage challenging its constitutionality on several grounds.  Although a preliminary injunction is in place to cover the Act's failure to make an exception for circumstances involving the health and life of the mother, the Act has otherwise been in force since February 2011.

The issue on this appeal is whether the district court erred in granting summary judgment in favor of the defendants on three of the four constitutional claims brought by Planned Parenthood facially challenging the Act.  Following the resolution of certain certified questions by the Ohio Supreme Court, the district court held that (1) the Act was no longer unconstitutionally vague, (2) the Act did not violate a woman's right to bodily integrity under the Fourteenth Amendment, and (3) the Act did not impose an undue burden on a woman's Fourteenth Amendment right to choose abortion.  The fourth claim, whether the Act unduly burdens a woman's right to health and life under the Fourteenth Amendment, is being held for trial and is not at issue on this appeal.

Upon review, we unanimously **AFFIRM** the district court's grant of summary judgment on Planned Parenthood's vagueness and bodily-integrity claims.  Judge

McKeague joined by Judge Rogers **AFFIRM** the district court's judgment in full. Judge Moore would reverse and remand on the undue-burden claim regarding the right to choose. Thus, this opinion is the opinion of the court with respect to all parts except Part VI, which is the opinion of Judge Moore dissenting in part, and Judge McKeague's opinion constitutes the opinion of the majority for Part VI. The judgment of the district court is therefore **AFFIRMED**.

## I. BACKGROUND

### A. Factual Background

Before 2000, most first-trimester abortions were surgical, performed by a procedure commonly known as vacuum aspiration or suction curettage. *Planned Parenthood Cincinnati Region v. Taft*, 444 F.3d 502, 505 (6th Cir. 2006) ("*Taft II*"). The parties agree that surgical abortions in the first trimester are extremely safe and, for most healthy women, can take less than five to ten minutes at an outpatient clinic, usually with only local anesthesia and often sedation. Briefly, a surgical abortion is performed by inserting a speculum into the woman's vagina, dilating the cervix, and then inserting a tube into her uterus that empties the contents by suction. Side effects include bleeding and cramping. Surgical abortions have been performed for decades, and the mortality rate is extremely low at roughly .1 per 100,000. R. 144-1 (Paul Decl. ¶¶ 14-20), *as cited by* R. 139-1 (Defs.' Mot. to Strike at 3 n.1) *and* Appellee Br. at 5.[1]

In 2000, the Food and Drug Administration ("FDA") first approved the distribution and use of mifepristone in the United States. Mifepristone, also called RU-486, is a medication that "terminates the pregnancy by detaching the gestational sac from the uterine wall." *Taft II*, 444 F.3d at 505 n.1. Approximately 24 to 48 hours later, the woman takes a second medication, misoprostol, which is "a prostaglandin which induces the contractions necessary to expel the fetus and other products of conception from the

---

[1]The State objects to the admissibility of the declaration of Dr. Maureen Paul. The district court has not yet ruled on the admissibility of her testimony, and we take no position on this evidentiary matter. We cite only her statements that are undisputed by the State.

uterus." *Id.*[2] Side effects of the procedure include bleeding for an average of nine to sixteen days and cramping and may also include fever, diarrhea, nausea, or vomiting. Joint Appendix ("J.A.") at 255 (FDA Patient Information Sheet at 1).[3] The parties agree that the mortality rate of mifepristone abortions is less than 1 per 100,000, but they debate the significance of this number. R. 144-1 (Paul Decl. ¶ 23), *as cited by* Appellee Br. at 5.

A U.S. manufacturer first filed a New Drug Application for mifepristone in 1996. J.A. at 187 (FDA Approval Letter at 1). Consistent with the three clinical trials submitted in support of the application, *see* J.A. at 192 (FDA Approved Labeling at 3), the "FDA labeling and approval letter indicated that the appropriate treatment regimen was to administer 600 mg of mifepristone orally followed by 0.4 mg of misoprostol administered orally two days later and that mifepristone was not to be administered after forty-nine days' gestation." *Taft II*, 444 F.3d at 505. The FDA approved mifepristone's application under 21 C.F.R. § 314 Subpart H, and imposed eight heightened restrictions on the post-approval distribution of the drug to "assure safe use." *See* J.A. at 188 (FDA Approval Letter at 2); 21 C.F.R. § 314.520.

Following FDA approval, additional clinical trials led to the development of new protocols for administering the drugs, one of which called for "200 mg of mifepristone administered orally followed one to three days later by 0.8 mg of misoprostol administered vaginally" and could be "employed up to sixty-three days' gestation." *Taft II*, 444 F.3d at 505-06. This new protocol, called the Schaff protocol, changed (1) the dosage amounts of the drugs, lowering the amount of mifepristone from 600 mg to 200 mg and increasing the amount of misoprostol from .4 mg to .8 mg; (2) the number of days between the drugs, from two days to between one and three; (3) the method of

---

[2] The Act does not explicitly ban or regulate the prescription of misoprostol, which has not been approved by the FDA for use in abortions, although it has been FDA approved for the treatment of ulcers.

[3] The main FDA documents were filed before the district court on plaintiffs' motion for a permanent injunction, which were then submitted to this panel as a Joint Appendix in the prior appeal. The exhibits were resubmitted by the parties to the district court for consideration on the summary-judgment motions; for ease of reference, we continue to cite the prior Joint Appendix to the extent that the parties relied on the same exhibits in support of summary judgment.

administering the misoprostol, from orally at the clinic to vaginally at home; and (4) the number of days' gestation up to which the protocol could be successfully performed, from 49 to 63 days after the woman's last menstrual period ("LMP"). The Schaff protocol was the primary protocol implemented at Planned Parenthood's Ohio clinics following the approval of mifepristone in 2000.

In 2006, Planned Parenthood's Ohio clinics shifted to a variation of the Schaff protocol that called for self-administration of the misoprostol buccally, i.e., via gum absorption. Because the first clinical trials for buccal administration initially only went up to 56 days LMP, Planned Parenthood limited this new protocol to that time period. By 2010, additional trials had demonstrated the safety and efficacy of buccal absorption up to 63 days LMP, and prior to the enforcement of the Act in 2011, Planned Parenthood began again offering patients the option of a medical abortion up to 63 days LMP. *See, e.g.*, R. 134-3, Ex. 1 (S.E. Ohio Medical Abortion Protocol at 385-86) (Page ID #2131-32).

Once a drug has been approved, the FDA does not ban the sort of "off-label use" that Planned Parenthood uses in its clinics, i.e., prescribing the drug for uses or in doses not identified in the approved labels.[4] *Taft II*, 444 F.3d at 505. The State does not dispute that "[i]t is standard medical practice in the United States for physicians to prescribe FDA-approved drugs in dosages and for medical indications that were not specifically approved—or even contemplated—by the FDA, particularly where the alternative use is supported by adequate study." R. 133-1 (State's Resp. to Pls.' Facts at ¶ 12) (Page ID #1994).

States, however, may limit off-label use. *Taft II*, 444 F.3d at 505. And on March 13, 2003, several members of the Ohio House of Representatives did just that, introducing House Bill 126 to regulate the distribution of RU-486 and to criminalize a

---

[4]The FDA regulates the marketing and distribution of drugs by manufacturers, not the practices of physicians in treating patients. However, manufacturers can apply to the FDA to update a drug's approval letter based on new studies. That has not been done in this case.

physician's failure to follow the regulations.  The Act was approved by both chambers and signed into law by the Governor on June 24, 2004, stating in relevant part:

> No person shall knowingly . . . prescribe RU-486 (mifepristone) to another for the purpose of inducing an abortion . . . unless the person . . . is a physician, the physician *satisfies all the criteria established by federal law* that a physician must satisfy in order to provide RU-486 (mifepristone) for inducing abortions, and the physician provides the RU-486 (mifepristone) to the other person for the purpose of inducing an abortion *in accordance with all provisions of federal law* that govern the use of RU-486 (mifepristone) for inducing abortions.

Ohio Rev. Code § 2919.123(A) (emphasis added).  The Act also bans physicians from "knowingly fail[ing] to comply with the applicable requirements of any federal law that pertain to follow-up examinations or care for persons to whom or for whom RU-486 (mifepristone) is provided for the purpose of inducing an abortion," and requires physicians prescribing mifepristone to submit reports under certain conditions.  *Id.* § 2919.123(B), (C).  Physicians who fail to comply with these terms will be "guilty of unlawful distribution of an abortion-inducing drug, a felony of the fourth degree," and also subject to administrative penalties, including revocation of professional licenses. *Id.* § 2919.123(E).  The Act defines "federal law" as "any law, rule, or regulation of the United States or any drug approval letter of the food and drug administration of the United States that governs or regulates the use of RU-486 (mifepristone) for the purpose of inducing abortions." *Id.* § 2919.123(F)(1).

Planned Parenthood submitted affidavits from clinic employees averring that from the introduction of mifepristone in the United States until 2010, regardless of which variation was in place, all of its patients chose one of the alternative dosage regimens over the FDA protocol.[5]  R. 134-3 (Brenner Decl. at ¶ 5) (Page ID #2114); R. 134-4 (Clawson Decl. at ¶ 5) (Page ID # 2150); R. 134-5 (Harrington Decl. at ¶ 5) (Page ID #

---

[5]Because the FDA protocol stops at 49 days LMP, all of the women between 49 and 63 days LMP would be using a non-FDA protocol regarding the gestational time limits and presumably the dosages would also mirror a non-FDA protocol as a result.

2180); R. 134-6 (Lonn Decl. at ¶ 5) (Page ID # 2186).[6]   Planned Parenthood's Ohio clinics offer medical abortions only through the administration of mifepristone with misoprostol. Depending on the clinic, Planned Parenthood reported that the percentage of women choosing medical abortions up to 63 days LMP in 2009 was anywhere between fourteen and fifty-five percent of its patients who were eligible. R. 134-3 (Brenner Decl. at ¶ 13) (Page ID #2115) (fourteen percent); R. 134-4 (Clawson Decl. at ¶ 16) (Page ID #2152) (fifty-five percent); R. 134-5 (Harrington Decl. at ¶ 12) (Page ID #2181) (twenty-two percent); R. 134-6 (Lonn Decl. at ¶ 14) (Page ID #2187) (twenty-three percent). When the total numbers are combined, Planned Parenthood performed a total of 6641 abortions up to 63 days LMP in 2009, of which 2067 were medical, or thirty-one percent.

Planned Parenthood offers evidence that the newer protocols have several advantages over the FDA-approved protocol, both in terms of women's health and access to abortions. The FDA plan does not permit the use of mifepristone after 49 days LMP, but many women do not detect their pregnancy until after 49 days LMP. R. 144-1 (Paul Decl. at ¶ 57) (Page ID #2393). The FDA plan requires a higher dosage of mifepristone, which Planned Parenthood asserts is not medically necessary (although it concedes the amount is safe). *Id.* at ¶ 58. Requiring the higher dosage of mifepristone (three pills instead of one) also raises the overall cost to the patient by about $150 for the two extra mifepristone pills alone, which depending on the clinic in question can amount to an increase in cost of twenty-eight to forty-two percent. R. 134-3 (Brenner Decl. at ¶ 9) (Page ID #2114) (medical abortions cost $545); R. 134-4 (Clawson Decl. at ¶ 12) (Page ID #2151) (medical abortions cost $410);[7] R. 134-5 (Harrington Decl. at ¶ 8) (Page ID #2180) (medical abortions cost $360); R. 134-6 (Lonn Decl. at ¶ 9) (Page ID #2186) (medical abortions cost $450). Because the FDA plan does not permit the self-administration of the misoprostol, the FDA plan involves the extra time, stress, and

---

[6]The State responds that Planned Parenthood may very well have recommended that its patients choose an alternative regimen.

[7]Clawson estimated an increase in cost from $410 to $700 when the extra medication as well as the extra clinic visit are both considered. R. 134-4 (Clawson Decl. ¶ 12) (Page ID #2151).

expense of a third doctor's office visit. The parties dispute whether the medical community accepts that the alternative protocols cause fewer side effects or have a higher success rate than the FDA-approved regimes.

Planned Parenthood also points out several reasons why a woman may prefer a medical abortion over a surgical abortion, aside from women with particular health conditions that make one option medically preferable over another. *See* R. 144-1 (Paul Decl. ¶¶ 49-55) (Page ID #2390-92) *but see* R. 139-1 (Defs.' Mot. to Strike at 11) (Page ID # 2337) (objecting to testimony on this subject because Paul is not a psychologist). We consider Paul's testimony on this subject only to the extent that it reflects Paul's personal experiences in providing abortions and the common sense observation that "women know their own needs and desires and choose the abortion method that is best for them." R. 144-1 (Paul Decl. ¶ 50) (Page ID #2390). The State does not argue that such statements are factually false. Indeed, one need not be a psychologist to observe that medical abortions involve ingesting medication rather than the insertion of instruments into the woman's body and that medical abortions terminate the pregnancy in the privacy of a woman's home through a process of bleeding as opposed to in a clinical setting. We need not conclude *why* women might prefer one procedure over the other to acknowledge that the differences between the two procedures are substantial and that such preferences may exist.

The State offers its own competing statistics regarding the frequency of medical abortions in Ohio. Ohio requires mandatory reporting of induced abortions, and the Ohio Department of Health reported that in 2008, 17.7% of abortions in Ohio were medical/non-surgical and 80% were surgical. R. 128-16 (Paulson Decl. ¶¶ 6-7) (Page ID #1930). The most common method of medical/non-surgical abortion was a combination of mifepristone and misoprostol.[8] *Id.* at ¶ 7. The State does not have data

---

[8]Medical abortions may also be performed using just a high dose of misoprostol, or by using the drug methotrexate in combination with misoprostol. The parties debate the safety, prevalence, and efficacy of these alternative medical abortions, but do not dispute that neither misoprostol nor methotrexate has been approved by the FDA for use in abortions. Planned Parenthood has a nationwide policy of not offering medical abortions with methotrexate because of the lack of medical evidence on its safety. At the preliminary injunction hearing, the plaintiffs' expert testified that methotrexate poses greater health risks than mifepristone when used for medical abortions, and we have previously determined this to be a fact

on how many medical abortions follow the FDA-approved protocol or an alternative protocol.  In the public version of the Ohio Department of Health's statistical report, Ohio observed that medical abortions were the "second most common" method of abortion in Ohio and that "[FDA] approval [of mifepristone] was expected to shift many of the early abortions from surgical to non-surgical methods."  *See* OHIO DEPARTMENT OF HEALTH, INDUCED ABORTIONS IN OHIO (2008), *available online at* http://www.odh.ohio.gov/healthstats/vitalstats/ abortionmainpage.aspx.[9]  The State argues that medical abortions using the FDA-approved protocol are safer than those that use off-label protocols.  Since implementation, the FDA received reports of eight deaths from serious infections following the use of mifepristone to terminate a pregnancy, seven of whom used vaginal administration of the misoprostol.  R. 128-13 (2/24/2010 FDA Mifeprex Q & A) (Page ID #1918).[10]  The FDA could not state whether the use of mifepristone was the cause of these deaths.  *Id.*

**B.  Procedural History**

After the Act was signed but before it took effect, Planned Parenthood sued the Ohio Governor, the Ohio Attorney General, and a class of local prosecutors in 2004 seeking to enjoin the enforcement of the Act.  From the beginning, Planned Parenthood has maintained that the Act is unconstitutional for four independent reasons:  (1) the Act is unconstitutionally vague; (2) the Act violates a woman's right to bodily integrity; (3) the Act imposes an undue burden on a woman's right to choose an abortion; and (4) the Act fails adequately to protect a woman's health and life.  Appellant Br. at 3.  To our knowledge, this is the first federal challenge to state laws restricting the use of mifepristone to reach the Court of Appeals.  On September 22, 2004, the district court issued a preliminary injunction enjoining enforcement of the entire Act on the likelihood

---

that the State did not contest.  *Taft II*, 444 F.3d at 512.

[9] The 2010 version of that same report, also publicly available online at http://www.odh.ohio.gov/healthstats/vitalstats/abortionmainpage.aspx, indicates that the percentage of medical/non-surgical abortions increased to 20%.

[10] Planned Parenthood rejects the State's argument that this shows the FDA plan is safer, noting that the statistic is also explained by the overall prevalence of the alternative regimen over the FDA protocols.  Appellant Br. at 15 & n.8.

of the plaintiffs' success with respect to the lack of an exception for the health and life of a woman. *Planned Parenthood Cincinnati Region v. Taft*, 337 F. Supp. 2d 1040 (S.D. Ohio 2004) ("*Taft I*").[11]

On appeal of the preliminary injunction, we held that the district court erred in treating a health and life exception as a per se requirement for an abortion regulation to be constitutional, but nonetheless affirmed the issuance of a preliminary injunction on the necessity of a health exception in this case. *Taft II*, 444 F.3d 502. In light of the Supreme Court's then-recent decision in *Ayotte v. Planned Parenthood of Northern New England*, 546 U.S. 320 (2006), however, we remanded for consideration of whether the injunction could be narrowed to prohibit enforcement of only the unconstitutional portions or whether the plaintiffs' other constitutional arguments warranted broad relief.

On remand, the district court granted the plaintiffs' motion for summary judgment on the first issue of vagueness and permanently enjoined the Act in its entirety on this separate ground. *Planned Parenthood Cincinnati Region v. Taft*, 459 F. Supp. 2d 626 (S.D. Ohio 2006) ("*Taft III*"). The district court held that the Act was ambiguous on whether compliance with the FDA-approved protocol was required or whether off-label use was permissible. Defendants appealed, and we sua sponte certified two questions of law to the Ohio Supreme Court. The questions were: (1) "Does [the Act] mandate that physicians in Ohio who perform abortions using mifepristone do so in compliance with the forty-nine day gestational limit described in the FDA approval letter?" and (2) "Does [the Act] mandate that physicians in Ohio who perform abortions using mifepristone do so in compliance with the treatment protocols and dosage indications described in the drug's final printed labeling?" *Planned Parenthood Cincinnati Region v. Strickland*, 531 F.3d 406, 412 (6th Cir. 2008) ("*Strickland I*").

The Ohio Supreme Court accepted the certified questions and answered both in the affirmative. *Cordray v. Planned Parenthood Cincinnati Region*, 911 N.E.2d 871

---

[11]Bob Taft was the Governor of Ohio at the time, succeeded by Ted Strickland. The parties have since stipulated to the dismissal of the Governor. Appellant Br. at 3 n.2. The lead defendant is now Ohio's Attorney General, Mike DeWine.

(Ohio 2009).  On August 6, 2009, we vacated the permanent injunction and remanded the case to the district court to consider *Cordray* in the first instance, leaving intact the previously affirmed preliminary injunction "per our previous opinion."  *Planned Parenthood Sw. Ohio Region v. Strickland*, 331 F. App'x 387 (6th Cir. 2009) ("*Strickland II*") (unpublished order).

On remand, the parties cross-moved for summary judgment, the plaintiffs again on their first claim of vagueness and the defendants on all four claims.[12]  The district court denied the plaintiffs' motion and granted the defendants' motion with respect to the plaintiffs' vagueness challenge, bodily integrity challenge, and undue burden on the right to choose challenge.  R. 161 (D. Ct. 5/23/11 Order).  The district court held that there remained genuine issues of material fact regarding the plaintiffs' undue burden claim with respect to a woman's health exception.  *Id.* at 26-27.  At Planned Parenthood's request, the district court entered final judgment under Federal Rule of Civil Procedure 54(b) on the three claims for which summary judgment for the defendants was granted and stayed the remaining proceedings pending appeal.  *Planned Parenthood Southwest Ohio Region v. DeWine*, No. 1:04-CV-493, 2011 WL 4063999, at *3 (S.D. Ohio Sept. 13, 2011) ("*DeWine*").  This appeal followed.

## II.  JURISDICTION

The district court had federal subject matter jurisdiction over Planned Parenthood's constitutional claims under 28 U.S.C. § 1331.  Our jurisdiction, however, is less straightforward.  We have jurisdiction under 28 U.S.C. § 1291 to review final orders of the district court.  Typically, when a district court grants summary judgment on some but not all claims, the decision is not a final order for appellate purposes.  However, under Federal Rule of Civil Procedure 54(b), the district court may certify a partial grant of summary judgment for immediate appeal "if the court expressly

---

[12]On remand, the district court also clarified the scope of the preliminary injunction to prohibit enforcement of the Act "only insofar as it prohibits off-label mifepristone abortions that are 'necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.'"  *Planned Parenthood Cincinnati Region v. DeWine*, No. 1:04-CV-493, 2011 WL 463093, at *1 (S.D. Ohio Feb. 4, 2011) (quoting *Taft II*, 444 F.3d at 511).  Pursuant to the district court's revised preliminary injunction, the Act may now be enforced in all other circumstances.

determines that there is no just reason for delay." Fed. R. Civ. P. 54(b). If Rule 54(b) certification is improper, we lack jurisdiction because there would be no final order from which the parties could take an appeal. *Lowery v. Fed. Express Corp.*, 426 F.3d 817, 820 (6th Cir. 2005); *see also Justice v. Pendleton Place Apartments*, 40 F.3d 139, 141 (6th Cir. 1994).

Proper certification under Rule 54(b) is a two-step process. "First, the district court must expressly direct the entry of final judgment as to one or more but fewer than all the claims or parties in a case. Second, the district court must expressly determine that there is no just reason to delay appellate review." *Gen. Acquisition, Inc. v. GenCORP, Inc.*, 23 F.3d 1022, 1026 (6th Cir. 1994) (internal quotation marks and alterations omitted). We apply de novo review to the district court's conclusions on the first inquiry and review for abuse of discretion the district court's determination of no just reason for delay. *Id.* at 1027.

The first inquiry—whether the district court entered judgment as to one or more but fewer than all of Planned Parenthood's claims—is a difficult question. The parties were asked to submit additional letter briefs on this issue, and on de novo review, we agree with them that the remaining claims are in fact separate from the one claim remaining below.

Courts apply many different tests to determine whether multiple claims exist for the purposes of Rule 54(b), and we have previously recognized that there is no "'generally accepted test'" for determining what constitutes a separate claim. *Gen. Acquisition*, 23 F.3d at 1028 (quoting 10 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2657 (3d ed. 1998)); *see also Liberty Mut. Ins. Co. v. Wetzel*, 424 U.S. 737, 743 n.4 (1976) (declining to adopt a definitive test). Our circuit has traditionally applied the "operative facts" test, which defines "[a] 'claim' under Rule 54(b) '[as] the aggregate of operative facts which give rise to a right enforceable in the courts' even if the party has raised different theories of relief." *GenCorp, Inc. v. Olin Corp.*, 390 F.3d 433, 442 (6th Cir. 2004) (quoting *Gen. Acquisition*, 23 F.3d at 1028), *cert. denied*, 546 U.S. 935 (2005); *McIntyre v. First Nat'l*

*Bank of Cincinnati*, 585 F.2d 190, 191 (6th Cir. 1978). We have held, for example, that a party brings only one "claim" under Rule 54(b) when he raises both a Title VII retaliation claim and a state-law breach-of-contract claim, where the basis for the alleged breach and the Title VII claim was the same retaliatory act by the employer. *Lowery*, 426 F.3d at 821. We reached a similar result in *General Acquisition*, where the "claims"—breach of fiduciary duty, fraud, and negligence—all required proof of the same facts leading up to the same hostile takeover and were functionally separate theories for recovering for the same injury. *Gen. Acquisition*, 23 F.3d at 1029.

We are mindful not to apply the "operative facts" test too broadly, however. In *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427 (1956), the Supreme Court sustained appellate jurisdiction over a dismissed Sherman Act claim even though it "rest[ed] in part on some of the facts that [we]re involved in" pending state-law claims, including a claim for unlawful destruction of one of the same businesses that served the basis of the Sherman Act claim. *Id.* at 437 n.9. We applied this same principle in *GenCorp*, where we concluded that the aggregate set of operative facts to support a claim of CERCLA contribution liability was wholly distinct from the facts necessary to support the claim of breach of insurance contract, despite the relationship of both claims to the same improper toxic waste disposal. *GenCorp*, 390 F.3d at 442.

We have not addressed the application of Rule 54(b) to multiple constitutional claims against the same statute before. Other circuits have, although sometimes applying different tests. *See, e.g.*, *Jordan v. Pugh*, 425 F.3d 820, 827 (10th Cir. 2005) (holding facial vagueness and First Amendment overbreadth challenge to same statute were one claim); *Samaad v. City of Dallas*, 940 F.2d 925, 930-32 (5th Cir. 1991) (holding equal-protection and takings-clause challenges were separate claims), *abrogated on other grounds as recognized by Rosedale Missionary Baptist Church v. New Orleans City*, 641 F.3d 86, 88-89 (5th Cir. 2011). In *Jordan*, for example, the Tenth Circuit relied heavily on the traditional overlap between facial vagueness and overbreadth challenges. The court treated the arguments as part of the same claim because both "involve[d] the same nucleus of facts, . . . require[d] similar analysis of the

terms and reach of the challenged provision[,]" and if raised on separate appeals, would require the court "to go over the same ground that it had covered in the first appeal." *Jordan*, 425 F.3d at 827-28 (internal quotation marks omitted).

We view these cases as informative and largely consistent with our approach today, but we decline to adopt a new test for analyzing multiple facial challenges to the same statute. Statutory challenges will certainly all contain at least one common operative fact—the passage of the challenged law. But the *aggregate* of operative facts will not necessarily include just the challenged law's existence; rather, we must also consider the facts relating to the law's impact on similar or distinct constitutional rights. A single law that causes distinct injuries to distinct constitutional rights is not so easily analogized to a single retaliatory employment action causing one injury that can be vindicated through multiple channels of relief.[13]  *See Lowery*, 426 F.3d at 821 (considering plaintiff's theories as all "seek[ing] to recover for the same underlying injury.").

With that in mind, we turn to the claims in this case. Here, there are four potential claims that all seek to disqualify the Act as unconstitutional and admittedly seek the same declaratory and injunctive relief. However, the aggregate of operative facts that give rise to each of the rights to be vindicated are sufficiently separate to confer jurisdiction despite the presence of some overlap. Count 1 alleges that the Act is unconstitutionally vague. The right at issue is the right of physicians to have notice of what behavior is criminal before they can be prosecuted. Because this is a legal question, the relevant inquiry is whether a reasonable physician would know that certain acts when performing an abortion are criminal or not. Count 2 alleges that the Act violates the right to bodily integrity of the women obtaining abortions. The facts necessary to establish this violation include proving that the Act will result in forcible

---

[13]Indeed, in the context of res judicata where a similar inquiry regarding "operative facts" is frequently made, the Seventh Circuit has advised that "courts should examine the 'facts' of a case at a sufficient level of specificity" and not consider them too broadly or too narrowly when identifying individual transactions, defined as "a single core of operative facts which give rise to a remedy." *Andersen v. Chrysler Corp.*, 99 F.3d 846, 852-53 (7th Cir. 1996); *see also* 18 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4407 (2d ed. 2002) (discussing "claims" for res judicata purposes).

physical intrusions by the state into a woman's body against their will and whether the state has a compelling need for such an invasion. Count 2 bears no relation to whether the Act gives physicians constitutional notice of criminal conduct.

Counts 3 and 4 are the most similar in that they both allege violations of the right not to have an undue burden imposed on the abortion decision. But although we apply the same legal framework to analyze both claims, the injuries (and the constitutional rights to be vindicated) are distinct from each other and from Counts 1 and 2. Count 3, the health and life argument, considers whether the Act imposes an undue burden on certain women with medical conditions that make a medical abortion safer than a surgical abortion, or an alternative protocol safer than the FDA protocol. Count 4, asserting a challenge based on the burden on the right to choose, considers whether the added costs and inconveniences of the FDA-protocol, or the lack of a medical option entirely in certain contexts, will prevent a large fraction of women from exercising their constitutional right to choose abortion. The alleged injuries affect entirely separate classes of women: those whose lives may be placed at risk by the Act (Count 3) and those whose decision to choose abortion will be unduly burdened by the extra hurdles imposed by the Act (Count 4). Whether the women with health issues are burdened by the Act bears no relation to whether the women with access issues will be burdened; proof of a constitutional violation against the rights of the former will depend on entirely separate facts from those necessary to prove a violation against the latter.

After reviewing the operative facts necessary to give rise to relief in each claim, we hold that their differences sufficiently outweigh what they have in common. Because each count involves distinct facts relating to separate injuries, each count is a separate claim for purposes of Rule 54(b).

The second inquiry is also satisfied here. The district court independently reviewed the request for Rule 54(b) certification and issued an order expressly determining that there was no just reason for delay and expressly directing the entry of final judgment as to one or more but fewer than all claims in this case. *DeWine*, 2011 WL 4063999, at *3; *see GenCorp*, 390 F.3d at 442. The district court explicitly weighed

the non-exhaustive list of factors we have provided for determining whether to find just reason for delay. Those factors include:

> (1) the relationship between the adjudicated and the unadjudicated claims; (2) the possibility that the need for review might or might not be mooted by future developments in the district court; (3) the possibility that the reviewing court might be obliged to consider the same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in set-off against the judgment sought to be made final; (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like.

*Corrosioneering, Inc. v. Thyssen Envtl. Sys., Inc.*, 807 F.2d 1279, 1283 (6th Cir. 1986).

The district court considered the separateness of the claims, the unlikelihood that the need for appellate review would be mooted by future developments, the unlikelihood of duplicate review of related issues, the lack of off-setting claims, and the possibility that immediate appeal would shorten the time and expense of trial. The district court's balancing of these issues was not an abuse of discretion. Therefore, we agree that certification under Rule 54(b) was proper in this case, and we have jurisdiction to entertain the appeal.

### III. STANDARD OF REVIEW

We review de novo a district court's grant of summary judgment. *Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006). In doing so, we review the evidence and draw all inferences in the light most favorable to Planned Parenthood as the non-moving party. *Id.* "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## IV.  VAGUENESS CLAIM

Planned Parenthood's first challenge is well-suited for summary judgment because it involves only a question of statutory interpretation.  An Act criminalizing certain abortion procedures will not be unconstitutionally vague if it "provides doctors of ordinary intelligence a reasonable opportunity to know what is prohibited[,] . . . sets forth relatively clear guidelines as to prohibited conduct[,] and provides objective criteria to evaluate whether a doctor has performed a prohibited procedure."  *Gonzales v. Carhart*, 550 U.S. 124, 149 (2007) (internal quotation marks omitted).  Given the constraints of the English language, a law need not contain "meticulous specificity" to avoid constitutional infirmity.  *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972).  It must reasonably "define[] the line between potentially criminal conduct on the one hand and lawful abortion on the other," *Gonzales*, 550 U.S. at 149.  The statute also must be read "precisely as the highest court of the State has interpreted it."  *Wainwright v. Stone*, 414 U.S. 21, 22-23 (1973) (internal quotation marks omitted).  A state's highest court is "the final arbiter of what is state law."  *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 236 (1940).

The district court initially held that the Act was unconstitutionally vague because the term "federal law" was not defined with sufficient certainty to provide notice of what the Act prohibited.  *Taft III*, 459 F. Supp. 2d at 637.  We agreed that each party had presented "contrary, yet plausible, interpretations," of the language in the Act requiring that doctors prescribing mifepristone "comply with 'federal law.'"  *Strickland I*, 531 F.3d at 407, 411.  The State viewed the language as requiring compliance with the FDA-approved protocol and gestational limits in the final printed labeling; Planned Parenthood viewed the language as requiring compliance only with the eight Subpart H restrictions addressing physician qualifications to prescribe the drug.  *Id.* at 411.  We therefore asked the Ohio Supreme Court to clarify, and the Ohio Supreme Court held that under the Act, "a physician may provide mifepristone for the purpose of inducing an abortion only through the patient's 49th day of pregnancy and only by using the dosage indications and treatment protocols expressly approved by the FDA in the drug's

final printed labeling as incorporated by the drug approval letter." *Cordray*, 911 N.E.2d at 879.**[14]** In light of this clarification, the district court held that the Act was no longer unconstitutionally vague because a reasonable person would know what conduct was prohibited. R. 161 (D. Ct. 5/23/11 Order at 18).

The simple fact that the Ohio Supreme Court adopted the State's interpretation of the Act does not mean that the Act is not unconstitutionally vague. However, we agree with the State that the Ohio Supreme Court's explicit interpretation of the Act in *Cordray* resolved any facial vagueness concerns we might have had. Planned Parenthood points to four primary areas that it argues the *Cordray* opinion leaves unresolved. The district court rejected all of these issues as either unsupported by *Cordray* or cured by scienter, and we agree. *See* R. 161 (D. Ct. 5/23/11 Order at 13-21).

First, Planned Parenthood argues that because *Cordray* reached its holding by incorporating parts of the final printed labeling ("FPL") into the approval letter, all ninety plus documents submitted in support of the approval letter must similarly be incorporated, including documents with unclear meaning. This same dilemma was presented to the Ohio Supreme Court in *Cordray*, however, and rejected. The Ohio Supreme Court explicitly discussed what requirements the FDA-approval letter incorporated from the FPL and why: "the FDA based its approval of mifepristone on its use as recommended in the labeling text, thereby incorporating that text into its letter of approval." *Cordray*, 911 N.E.2d at 878. The recommended use in the FPL consisted of the "gestational limit, dosage indications, or treatment protocols" approved by the FDA. *Id.* at 877. Lest there be any ambiguity in that, the Ohio Supreme Court specifically stated that "[a]dministering mifepristone to induce an abortion beyond the 49th day of pregnancy," or "[u]sing any other dosage indication or treatment protocol" other than

---

**[14]**The lead opinion in *Cordray* is only a plurality; however, a majority of justices joined the syllabus and the judgment, which clearly incorporated the final printed labeling's gestational limits, treatment protocols, and dosage indications into the FDA approval letter. *Cordray*, 911 N.E.2d at 873. The parties both cite the plurality opinion as the opinion of the Ohio Supreme Court, and we will rely on it as well. A plurality opinion still offers useful guidance on how a state court is likely to interpret a state statute, and, as a federal court interpreting state law, we are obligated to respect that guidance. *Cf. West*, 311 U.S. at 236-37 (counseling federal courts additionally to consider accepted rules of inferior state courts when elucidating state law).

the FDA-approved protocol, "would not be in accordance with the drug approval letter" and would be a violation of the Act. *Id.* at 878.[15] Planned Parenthood's ability to point to other documents on which the FDA may have also "based its approval of mifepristone" lifts one phrase from the *Cordray* opinion out of its otherwise unmistakable context. A reasonable physician would not think that he had to scour the other ninety documents cited in the approval letter, which mostly consisted of studies and evidence in support of approving the drug, to determine whether his planned use of mifepristone would be legal.

Second, Planned Parenthood argues that even if only the FPL is incorporated, the Act is still vague because the FPL itself consisted of four documents, which contain internal contradictions that might confuse physicians. For example, Planned Parenthood notes that the Medication Guide recognizes that physicians prescribe drugs "off-label." But no reasonable physician would view this reference as permitting off-label prescription of mifepristone when *Cordray* makes clear that physicians must stick to the FDA protocol. When a state's highest court interprets a statute, its construction is considered part of the statute itself. *Wainwright*, 414 U.S. at 22-23. Mathematical certainty is not required. *Grayned*, 408 U.S. at 110.

Third, Planned Parenthood argues that the FPL is subject to frequent revision, with no clear instruction to physicians on what would happen in the event of a revision. Appellant Br. at 32. However, the risk of possible revision is not enough to make the Act unconstitutionally vague on its face when the Act is otherwise clear. This argument was also presented and addressed by the Ohio Supreme Court. *Cordray* noted that despite two subsequent revisions, none had altered the gestational limits, dosage indications, or treatment protocols "originally approved by the FDA." 911 N.E.2d at 875. If and when the FDA makes revisions to the approved regimen in the FPL that

---

[15]The opinion also references "three office visits," defeating Planned Parenthood's argument that the Act is unclear regarding whether the misoprostol can be administered at home; it cannot. *Cordray*, 911 N.E.2d at 874 ("[T]reatment with mifepristone requires three office visits by the patient. . . . On day three, the patient returns to the provider for an oral dose of 400 µg of misoprostol.").

render *Cordray*'s interpretation of the Act vague, a future challenge will be better suited to reviewing such changes rather than our engaging in speculative guesses today.

Fourth, Planned Parenthood points to other supposedly vague terms still present in the Act, such as "criteria" or "provisions," claiming that these terms make it impossible to ascertain what is prohibited. Appellant Br. at 36. But *Cordray* made clear what a physician must to do comply with the Act. Any risk of uncertainty regarding hidden, extra requirements is cured by the scienter provisions, which forbid penalty under the Act unless a doctor knowingly violates one of the requirements. A physician with a good-faith belief that a certain action would comply with the Act or a physician who accidentally takes an action not in compliance with the Act would not be penalized. *Gonzales*, 550 U.S. at 149-50. The same exception would apply to physicians who intend that their patients return for the requisite follow-up visit, but whose patients decide on their own not to come. *See id.* at 155. Planned Parenthood's remaining vagueness arguments relating to specific hypothetical scenarios that are best left to future, as-applied challenges should an individual be prosecuted under an obscure reference in one of those documents. As interpreted by the Ohio Supreme Court, the Act is not vague.

## V. BODILY-INTEGRITY CLAIM

Under the substantive due process clause of the Fourteenth Amendment, individuals possess a constitutional right to be free from forcible physical intrusions of their bodies against their will, absent a compelling state interest. *See Winston v. Lee*, 470 U.S. 753, 766 (1985) (state cannot surgically remove potential evidence from a suspect's body without consent given the severity of the intrusion and lack of compelling state interest); *Schmerber v. California*, 384 U.S. 757, 771-72 (1966) (forcible blood-alcohol test constitutional because specific individual's risk of trauma or injury low and state's interest in evidence high). Planned Parenthood argues that the Act in this case is akin to a forcible physical intrusion because women who desire a medical abortion between 50 and 63 days LMP are "forced" to undergo surgery due to the unavailability of mifepristone during those days. *See* Appellant Br. at 44 (arguing that surgical

abortions are "forced," despite being performed with patient consent, because the woman would have had a medical abortion but for its unavailability).

The Fourteenth Amendment undoubtedly protects as a liberty interest the right against forcible physical intrusions of the body by the government. *Rochin v. California*, 342 U.S. 165, 172-73 (1952) (state cannot forcibly pump detainee's stomach to obtain evidence). Although the Supreme Court has declined formally to label its review in this context as "strict scrutiny," *see Riggins v. Nevada*, 504 U.S. 127, 136 (1992), the cases still ask whether the government has adequately demonstrated a compelling need for the intrusion, a lack of reasonable alternatives, as well as procedural and medical safeguards, *see id.* at 135-36.[16] *See also Washington v. Harper*, 494 U.S. 210, 229 (1990) ("The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty" requiring an important and legitimate state interest); *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 269, 281 (1990) ("This notion of bodily integrity has been embodied in the requirement that informed consent is generally required for medical treatment," but state also has interest in life and informed consent).

Although we understand why Planned Parenthood took this approach—requiring the government to show a compelling state interest for the Act would relieve Planned Parenthood of its obligation to show an undue burden on the right to choose an abortion—this argument is unconvincing. "Strict scrutiny, of course, no longer applies to abortion legislation." *Women's Med. Prof'l Corp. v. Taft*, 353 F.3d 436, 444 (6th Cir. 2003). The Supreme Court has made clear that abortion regulations, even those limiting access to a certain kind of procedure, are analyzed under the undue-burden framework and not the classic physical-intrusion framework discussed above. We could just as easily say that the partial-birth abortion ban "forces" a woman to have a D & E abortion when she may prefer (the banned) D & X abortion, but that does not negate the consent the woman must give in order for her physician to perform the procedure. If the only

---

[16]Bodily integrity claims have occasionally been given strict-scrutiny review by the lower courts. *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1064 (6th Cir. 1998) (reviewing with strict scrutiny a claim that release of private information threatened individual's personal security and bodily integrity).

available abortion method is so undesirable as to make the woman choose to have no abortion at all, the undue-burden framework remains the appropriate remedy for addressing that concern.

We emphasize, however, that policies restricting a method of abortion do impact a woman's right to bodily integrity. "As far back as 1891, the Supreme Court recognized that no right is held more sacred, or is more carefully guarded[,] than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1062 (6th Cir. 1998) (internal quotation marks and alterations omitted); *see also Soper v. Hoben*, 195 F.3d 845, 852 (6th Cir. 1999), *cert. denied*, 530 U.S. 1262 (2000). Government restrictions on abortions are a form of interference with the right to bodily integrity and control over an individual's person. *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 896 (1992) ("The effect of state regulation on a woman's protected liberty is doubly deserving of scrutiny in such a case, as the State has touched not only upon the private sphere of the family but upon the very bodily integrity of the pregnant woman.") (citing *Cruzan*, 497 U.S. at 281).

By making a bodily-integrity claim part and parcel with a right-to-privacy claim, *Casey* and its progeny serve as the proper cases for examining bodily-integrity claims in the abortion context. In light of these abortion-specific cases applying the undue-burden framework, there is little constitutional support for Planned Parenthood's attempt to return to the stricter balancing standard used in traditional bodily-integrity claims. Thus, the argument that the Ohio restrictions unduly impact a woman's right to bodily integrity is a viable claim, but, from a purely legal perspective, the analysis will map the undue-burden framework set out in Planned Parenthood's third claim of constitutional infirmity.

## VI.  UNDUE-BURDEN CLAIM

### (Judge Moore's Partial Dissent)

"'[A] law designed to further the State's interest in fetal life which imposes an undue burden on the woman's decision before fetal viability' is unconstitutional." *Stenberg v. Carhart*, 530 U.S. 914, 921 (2000) (quoting *Casey*, 505 U.S. at 877). "[U]ndue burden is . . . shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U.S. at 877. On summary judgment, we review the evidence in the light most favorable to Planned Parenthood. When thus viewing the evidence, I would hold that the State has failed to demonstrate an absence of a genuine dispute of material fact regarding whether the Act imposes a substantial obstacle in the path of Ohio women seeking to obtain an abortion of a nonviable fetus. Summary judgment for the State was therefore inappropriate as to this claim.

A number of adverse effects[17] of the Act are undisputed. The Act (1) requires additional clinical visits, potentially increasing costs and inconvenience; (2) the Act requires a higher dosage of mifepristone, also increasing costs; and (3) the Act makes mifepristone unavailable to women between 50 and 63 days LMP, functioning as a total ban on medical abortions for these women and leaving surgery as the only option for terminating their pregnancies. R. 161 (D. Ct. 5/23/11 Order at 27-28) (Page ID #2654-55). The first two effects relate to the dosage and treatment protocols and do not constitute an outright ban on any particular method. The district court concluded that these "may increase the cost of the procedure," but under *Casey*, "the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate" the law. *Id.* at 28. The third effect, the gestational limit, amounts to a total ban on medical abortions for women between 50 and 63 days LMP. The district court

---

[17]Although *Casey* discusses the "purpose or effect" of the challenged legislation, Planned Parenthood does not attempt to argue that Ohio had an illicit purpose in passing the Act and focuses solely on the Act's effects. The fact that the Act focuses solely on abortions (and not other off-label uses of mifepristone) certainly raises some eyebrows, but we will not presume a harmful purpose without evidence of an illicit motive. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

concluded that this was not an undue burden because "it is undisputed that the Act does not impact the[] ability to choose a safe, commonly used method of abortion," i.e., a surgical abortion. *Id.* The parties debate the meaning of "substantial obstacle," and I discuss the proscriptions each in turn, starting with the total method ban for women past 49 days LMP.

**A.  Outright Ban on Medical Abortions During 50 to 63 Days LMP**

The Supreme Court has not explicitly defined when a total method ban constitutes a "substantial obstacle" to a woman's exercise of her rights. Planned Parenthood argues that any regulation that prohibits a "commonly used method" of abortion is a substantial obstacle and therefore imposes an undue burden. The State argues that regulations banning a particular method are a substantial obstacle only if they serve to inhibit the "vast majority" of abortions such as by banning the "most common" procedure for obtaining those abortions.

The Supreme Court first addressed complete bans on a particular method in *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52 (1976). *Danforth* struck down a law banning "the use of a method which the record shows is the one most commonly used nationally by physicians after the first trimester and which is safer, with respect to maternal mortality, than even continuation of the pregnancy until normal childbirth." *Id.* at 78. *Casey* did not overrule *Danforth*, and we have interpreted *Casey* as clarifying that before viability, the question is "whether 'in a large fraction of the cases in which [the ban] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion.'" *Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 196 (6th Cir. 1997) (quoting *Casey*, 505 U.S. at 895), *cert. denied*, 523 U.S. 1036 (1998).[18]

The only other previability method bans reviewed by the Supreme Court involve partial-birth abortion techniques in the second trimester. In *Stenberg*, similarly to

---

[18]*Casey* itself was not a method-ban case and analyzed whether certain restrictions such as informed-consent and spousal-notification laws constituted an undue burden. *Casey*, 505 U.S. at 895.

*Danforth*, the Supreme Court held that because dilation and evacuation procedures ("D & E") were "the most commonly used method for performing previability second trimester abortions," Missouri's ban imposed "an undue burden upon a woman's right to make an abortion decision" if it covered D & E abortions. *Stenberg*, 530 U.S. at 945-46. The only issue in the case was the scope of the statute—the state conceded that if the statute banned D & E abortions and not just the smaller subclass of dilation and extraction ("D & X") abortions, before viability, the statute imposed an undue burden on the right to choose abortion. *Id.* at 938.

In *Gonzales*, the Supreme Court upheld a federal abortion ban because the statute prohibited only D & X abortions (called "intact D & E" abortions in the opinion), and the plaintiffs had failed to show "that the Act would be unconstitutional in a large fraction of relevant cases." *Gonzales*, 550 U.S. at 167-68. Again, the Attorney General conceded that "the Act would impose an undue burden if it covered standard D & E." *Id.* at 147. Unlike in *Danforth*, "the [Partial-Birth Abortion Ban] Act allows, among other means, a commonly used and generally accepted method," a method that was almost identical from the patient's perspective to the banned method, "so it does not construct a substantial obstacle to the abortion right." *Id.* at 165.

This court has also addressed method bans similar to the ones in *Danforth*, *Stenberg*, and *Gonzales*. In *Wolfe v. Schroering*, 541 F.2d 523, 526 (6th Cir. 1976), we invalidated a Kentucky statute that was "virtually identical" to the one struck down in *Danforth* because the "instant record reflects that the saline method, at the enactment of the statutory prohibition, was the only available method in Kentucky, thus making its prohibition 'almost tantamount' to a prohibition of post-first trimester abortions." *Id.* at 526-27. In *Voinovich*, we struck down an Ohio statute banning partial-birth abortions as imposing an undue burden because the statute's plain meaning included the D & E method, "the most common method of abortion in the second trimester." *Voinovich*, 130 F.3d at 201; *see also Northland Family Planning Clinic, Inc. v. Cox*, 487 F.3d 323, 337 (6th Cir. 2007) (striking down Michigan law because unclear if statute banned D & E abortions, which "would prohibit several of the most common pre-viability

abortion methods"), *cert. denied*, 552 U.S. 1096 (2008). In *Women's Medical*, we affirmed the validity of a statute after determining that the ban applied to D & X abortions. "[B]ecause the Act does not restrict the most commonly used procedure for second trimester abortions . . . we conclude that it does not impose an undue burden on a woman's right to abort a non-viable fetus." *Women's Med.*, 353 F.3d at 453.

What these cases tell us is that, at the least, statutes banning the most common method of an abortion impose an unconstitutional burden on a woman's rights. The cases do not engage in a strict mathematical inquiry of percentages to identify the frequence of a procedure, nor, as facial challenges, do they demand affidavits from women indicating that they would not obtain an abortion via some other lawful method if D & E abortions were made unavailable. We can safely presume that a statute banning the most common method of abortions for a certain group of women imposes a substantial obstacle on the ability of a woman to obtain an abortion. But that does not tell us whether a ban on *any* common method could not also constitute a "large fraction" under *Casey*.[19]

The State relies heavily on the use of the phrase "vast majority" in Supreme Court jurisprudence when describing the most common method to suggest that any common method can be banned so long as the most common method remains. In *Gonzales*, the Supreme Court stated that the ban on D & X abortions "cannot be held invalid on its face" because the requirement would not "prohibit the vast majority of D & E abortions." *Gonzales*, 550 U.S. at 156. But we must be mindful of the factual distinctions between such cases and ours. Neither we nor the Supreme Court have addressed a ban on a method demonstrably preferred by, for example, a third of similarly situated women, particularly when that method is highly dissimilar from the remaining methods. Such a method may not be the "most common," but one could easily classify a third as a "large fraction" or decline to label the remaining method a "vast majority."

---

[19]The State seizes on the fact that we later repeated the "most common[]" language when discussing a state ban on D & X procedures, *see Women's Med.*, 353 F.3d at 453, but we were engaged solely in the task of statutory construction, not in determining whether D & X abortions constituted a large fraction (because *Gonzales* had just held that it did not). *See also Voinovich*, 130 F.3d at 201 ("[I]t follows that a statute which bans a common abortion procedure would constitute an undue burden.").

When *Gonzales* points to the existence of a "commonly used and generally accepted method" as a reason for sustaining the ban, we must read this language in the context of the methods being discussed. *Id.* at 165.

In *Gonzales*, the Supreme Court highlighted the similarities between D & E abortions and D & X abortions, which the opinion even calls "intact D & E" abortions because they are a "D & E variation." *Gonzales*, 550 U.S. at 136-37. Both D & X and D & E abortions involve the same "general steps": dilating the cervix, inserting surgical instruments into the woman, placing the woman under general anesthesia or sedation, inserting forceps, and evacuating the fetus. *Id.* at 135-36. The decision whether to perform a D & X abortion or D & E abortion appears largely up to the physician and not the patient. *Id.* at 137. The primary difference related to the destruction of the fetus—D & X abortions resemble a live birth because the fetus is removed almost entirely and terminated outside the womb rather than termination during (or even before) the procedure itself.

The frequency of the D & X method, although statistically unclear with any certainty, was also very infrequent relative to standard D & E abortions. The Supreme Court referenced the district court opinion for many of its facts, which noted that most doctors reported D & X abortions occurring in five to fifteen percent of all D & E procedures; D & E abortions as a whole, depending on the gestational age, constituted between eighty-five to ninety-five percent of second-trimester abortions. *See Planned Parenthood Fed'n of Am. v. Ashcroft*, 320 F. Supp. 2d 957, 965 (N.D. Cal. 2004), *as cited by Gonzales*, 550 U.S. at 155. The banned procedure therefore only affected (at most) fourteen percent of women in those gestational ranges. Given the infrequency of the procedure being analyzed in *Gonzales* and subsequent cases, the language in *Gonzales* does not suggest that the Supreme Court would reach the same result for a ban of a method chosen in thirty-one percent of first-trimester abortions, particularly where the differences in the available procedures make it difficult for us to assume that the methods are interchangeable from the perspective of the female.

With that in mind, I turn to the facts of this case. When viewed in the light most favorable to Planned Parenthood, the evidence suggests that medical abortions were elected over surgical abortions on average by about thirty-one percent of Planned Parenthood's patients in 2009. The State reminds us that Planned Parenthood is not the only abortion provider in Ohio, but even the State's number, that 17.7% of cases in 2008 were medical/non-surgical, is a non-trivial percentage. And, in the very study cited by the State for its statistic, the Ohio Department of Health observed that FDA approval of mifepristone "was expected to shift many of the early abortions from surgical to non-surgical methods." OHIO DEPARTMENT OF HEALTH, INDUCED ABORTIONS IN OHIO (2008), *available online at* http://www.odh.ohio.gov/healthstats/vitalstats/abortionmainpage.aspx. Indeed, by 2010, that same category had increased to 20 percent.

We should not expect Planned Parenthood to present specific numbers of women who would not have obtained a surgical abortion at all had the medical abortion been unavailable. As an initial matter, the Act was not enforced in Ohio until February 2011 when the district court clarified the scope of the preliminary injunction. Planned Parenthood suspended the provision of medical abortions at its Ohio clinics in January 2011. *See, e.g.*, R. 153-1 (2d Brenner Decl. at ¶ 3) (Page ID #2535). Since then, Planned Parenthood had to deny medical abortions to between 50 and 100 women. R. 153 (Pls.' Mem. Prelim. Inj. at 4) (Page ID #2516). The majority fixates on the affidavits of nine of those women who testified that they thereafter obtained a surgical abortion, despite the extra anxiety and pain it caused them, as conclusively establishing as a matter of law that the method ban in this case does not impose a substantial obstacle in a large fraction of women. But women deterred by the ban who decided not to obtain any abortion at all would be unlikely to return to Planned Parenthood's clinics or volunteer to give their names or testimony.

More importantly, the majority points to no case either from our court or the Supreme Court requiring affirmative testimony from individual women that they would not have obtained an abortion but for the ban to establish that a total method ban imposes

a substantial obstacle. *See Stenberg*, 530 U.S. 914 (not considering whether women could just as easily obtain an abortion using alternative method if D & E method were banned); *Danforth*, 428 U.S. at 75-76 (same for saline amniocentesis method).[20] Planned Parenthood's facial challenge to the Act, which was first filed in 2004 before the Act was ever enforced, does not rely on the sort of as-applied testimony that the dissent seeks. As discussed above, it is hard to imagine how Planned Parenthood would even gather such data. That difficulty will be present in many cases and cannot be a reasoned basis for ignoring the potential burdens of the Act on a woman's constitutional rights.

Nor has the Supreme Court defined "substantial obstacle" as requiring a showing of a *total* obstacle. Just by examining the physical differences between the methods, our common sense tells us that the differences between the procedures from the perspective of the woman are substantial. Surgical abortions, as the name suggests, require surgery, a physically invasive procedure, including sedation and potentially even general anesthesia, and a procedure in the sterile environment of an outpatient clinic. Medical abortions, on the other hand, consist primarily of ingesting pills and terminating the pregnancy in the privacy of the woman's home. Three years ago, almost a third of women chose this second method. We simply should not conclude as a matter of law that every woman who would prefer a medical abortion would be equally likely to obtain a surgical abortion on the basis of nine affidavits. These are questions of fact ill-suited for resolution on summary judgment.

At the very least, the frequency of medical abortions among women prevents us from concluding as a matter of law that medical abortions do not constitute a "large fraction" among women within the specific gestational time frame banned by the Act—50 to 63 days LMP. The sheer fact that roughly a third of Planned Parenthood's patients have elected a medical abortion over a surgical abortion suggests that eliminating medical abortions may cause a large fraction of women to forego having an

---

[20]I therefore reject the State's position that Planned Parenthood must explicitly "quantify the number of women deterred" in order to make its case. Appellee Br. at 47 n.7.

abortion altogether. The State's own statistics suggest a rise in popularity of this procedure, and the Supreme Court itself has acknowledged that the most common procedure can change over time. *Stenberg*, 530 U.S. at 924. The parties should be permitted to present expert testimony on the subject in order to understand better whether this case really is similar to the method ban affirmed in *Gonzales* or is a different creature entirely. We therefore cannot conclude as a matter of law that the existence of surgical abortions for women between 50 and 63 days LMP makes Ohio's ban on all medical abortions during that time frame constitutional. For all these reasons, I dissent from the majority view expressed in Judge McKeague's opinion.

**B. Restrictions on Dosage and Treatment Protocols**

That brings us to the restrictions that the Act imposes on medical abortions during the first 49 days LMP. "[N]ot every law which makes a right more difficult to exercise is, *ipso facto,* an infringement of that right." *Casey*, 505 U.S. at 873. The parties generally agree that Planned Parenthood must show that the restrictions in the Act must have more than just "the incidental effect of making it more difficult or more expensive to procure an abortion." *Id.* at 874 (upholding 24-hour waiting period as not a substantial burden); *Wolfe*, 541 F.2d at 526 (same because does not "significantly burden[] the abortion process."). *Casey* also affirmed additional reporting requirements, because "[a]t most they might increase the cost of some abortions by a slight amount. While at some point increased cost could become a substantial obstacle, there is no such showing on the record before us." *Casey*, 505 U.S. at 901 (rejecting district court finding that added costs of travel time and potentially lodging from requiring a 24-hour waiting period were a substantial obstacle); *see also Planned Parenthood Ass'n of Kansas City, Mo., Inc. v. Ashcroft,* 462 U.S. 476, 486, 490 (1983) (holding no undue burden in law requiring tissue sample be taken during abortion because cost increased by only twenty dollars and state imposed requirement in all surgeries to ensure safety).

In light of these cases, I agree with the district court that requiring a third doctor's visit adds an insubstantial cost to procuring a medical abortion. The extra visit appears no different from the extra visit caused by a 24-hour waiting period, which the

Supreme Court has explicitly deemed a valid regulation. I cannot say that the same is true for the dosage requirements, however. The district court concluded that there is little evidence to suggest that any women before 49 days LMP will be deterred from obtaining an abortion because of the dosage and treatment restrictions on a medical abortion. R. 161 (D. Ct. 5/23/11 Order at 29) (Page ID # 2656). But on summary judgment, we must view the record in the light most favorable to Planned Parenthood. Planned Parenthood offered testimony that the FDA-protocol's usage of 600 mg of mifepristone would increase the cost of an abortion by $150, a significant increase over what it otherwise costs patients, over forty percent in some clinics. We have no way of knowing if these women are the exception or the rule, because the resolution of these questions is usually done after the consideration of testimony and evidence. *See Cincinnati Women's Servs., Inc. v. Taft*, 468 F.3d 361, 369 (6th Cir. 2006) (emphasizing need to examine closely factual record).

The majority again feels comfortable resolving these fact questions on summary judgment against Planned Parenthood due to the price difference between surgical abortions and medical abortions. But the majority ignores the fact that the very reason surgical abortions are now less expensive is because the Act requires the medical abortions to use more medicine. Again, a "substantial obstacle" has never been defined as a total obstacle. And in evaluating the impact of restrictions, rarely do courts rely exclusively on percentages. *See id.* at 374 ("[T]he term 'large fraction,' which, in a way, is more conceptual than mathematical, envisions something more than the 12 out of 100 women identified here."); *Planned Parenthood, Sioux Falls Clinic v. Miller*, 63 F.3d 1452, 1459-63 (8th Cir. 1995) (holding parental notification laws unduly burdened a "large fraction" without attempting to quantify the number of minors affected by provision; treating "substantial obstacle" as the "possibility of such obstruction—or even attempted obstruction" and not a guaranteed inability to obtain an abortion), *cert. denied*, 517 U.S. 1174 (1996); *see also Casey*, 505 U.S. at 894-95 (striking down spousal-notification law because within group of affected women, which was only one percent of the whole, a "large fraction" would be deterred by the notification laws based not on

specific affidavits or percentages but on evidence of the "persisting conditions" explaining why such women might be deterred).

The extent of the Act's burden on a woman's constitutional rights, as it relates to the gestational limits and the dosage requirements, is a genuinely disputed issue of material fact not ripe for summary judgment in this case. Therefore, I dissent from the contrary view expressed in Judge McKeague's majority opinion.

## VII.  CONCLUSION

For the reasons expressed in Parts I through V and in Judge McKeague's opinion, the judgment of the district court is **AFFIRMED**.

---

**CONCURRING IN PART AND
WRITING THE MAJORITY AS TO PART VI**

---

McKEAGUE, Circuit Judge, concurring in part and writing the majority as to Part VI. I agree with Judge Moore's opinion as to parts I–V. I write separately with regard to Planned Parenthood's undue burden claim because, as Judge Dlott's well-reasoned opinion stated: "Even viewing the evidence in the light most favorable to [Planned Parenthood], it is clear that the record does not create a triable issue of material fact as to whether the Act has the effect of creating a substantial obstacle to the abortion right. There is no evidence that the Act would impose an undue burden on 'a woman's ability to make th[e] decision to have an abortion.'" (Order Granting in Part Mot. Sum. J. at 28, Page ID # 2655 (quoting *Planned Parenthood Se. Penn. v. Casey*, 505 U.S. 833, 874 (1992) (second alteration in original)).

As Judge Moore's opinion correctly notes, we must view the inferences to be drawn from the underlying facts in the light most favorable to Planned Parenthood. *See Matushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The two parts of the Act that Planned Parenthood claims create an undue burden discussed here are: (1) the ban on medical abortions between 50 and 63 days LMP, and (2) the increased dosage requirements. Review of the evidence shows that the district court correctly concluded that the record simply does not give rise to a reasonable inference that the Act imposes a substantial obstacle for Ohio women deciding whether to abort a pregnancy. Therefore, these claims cannot survive summary judgment.[1]

---

[1] Judge Moore refers to this conclusion as "resolving these fact questions,"and "conclusively establishing as a matter of law that the method ban in this case does not impose a substantial obstacle . . . ." *See ante* at ¶¶ 57, 63. Not at all. Instead, on the record before us and under the summary judgment standard, Planned Parenthood did not sustain its burden of adducing enough evidence to create a genuine question of fact. For an issue of fact to be genuine, the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 US 574, 586-587 (1986). Planned Parenthood has not carried its burden in this case.

**A.  Method Ban on Medical Abortions 50–63 days LMP**

It is true that governing case law analyzing method bans in the context of "partial-birth" techniques does not provide controlling guidance for this case.  At most, the Supreme Court in *Gonzales v. Carhart*, 550 U.S. 124, 150-54 (2007), instructed that state action is likely to constitute an undue burden where the most common abortion technique available to a particular subset of women is prohibited.  Likewise, our case law indicates a statute that "restrict[s] the most commonly used procedure" is likely to be problematic.  *Women's Med. Prof. Corp. v. Taft*, 353 F.3d 436, 453 (6th Cir. 2003).  So if this case involved a method ban on surgical abortion, which is the most common procedure at 50–63 days LMP, but left open the option of medical abortion, *Gonzales* would dictate the result.

But here, viewing the evidence in the light most favorable to Planned Parenthood, we examine a method preferred by approximately 31% of women to whom it is available.  Because jurisprudence from the Supreme Court and this Circuit does not clearly address a method ban comparable to the instant one, we are left to apply the more general undue-burden standard.  Thus, for Planned Parenthood to survive summary judgment, there must be a genuine dispute of material fact as to whether "'in a large fraction of the cases in which [the Act] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion.'" *Women's Med. Prof. Corp. v. Voinovich*, 130 F.3d 187, 196 (6th Cir. 1997) (quoting *Casey*, 505 U.S. at 895)).

Importantly, the Supreme Court has not articulated any rule that would suggest that the right to choose  abortion encompasses the right to choose a particular abortion method.   In one dissenting opinion, Justice Stevens suggested that a woman's constitutionally protected liberty interest in the right to choose an abortion has "two components—her decision to terminate the pregnancy and her decision concerning the method of doing so." *Benten v. Kessler*, 505 U.S. 1084, 1085 (1992) (per curiam) (Stevens, J., dissenting) (holding—less than one month after *Casey*—that a woman who had mifepristone pills confiscated before the FDA approved the drug could not compel the agency to return her dose because she had not demonstrated a substantial likelihood

of success on the merits but declining to reach the undue-burden issue, stating "we express no view on the merits of this assertion"). But the Court has not expressly endorsed an approach that would protect the right to choose *a particular method* of abortion. *See Casey*, 505 U.S. at 874 ("'the [abortion] right protects the woman from unduly burdensome interference with her freedom to decide whether to terminate her pregnancy.'" (quoting *Maher v. Roe*, 432 U.S. 464, 473–74 (1977))).

Planned Parenthood submitted a list of disputed issues of material fact in opposition to summary judgment. Assuming the evidence therein is admissible, the organization alleges that "first trimester surgical abortion is an invasive procedure that many women seek to avoid" and that abortion is an emotional procedure and there are many factors that affect the particular procedure a woman may elect. (Plaintiff's Resp. to Ohio's Prop. Undisputed Facts, Page ID # 2072.) The organization also submits that "[o]nce women are counseled about both medication and surgical abortion, most women demonstrate a strong and clear preference for the type of procedure [that they] choose and are satisfied with that method." (*Id.* at Page ID # 2073.) Some of the specific reasons that Planned Parenthood says "[w]omen choose medication" are a higher degree of personal control, the feeling that a medical abortion is more natural, and the ability to execute a medical abortion in the privacy of the woman's home. (*Id.*) Finally, Planned Parenthood states "for victims of rape, or for women who have experienced sexual abuse or molestation, medication abortion is often less traumatic . . . [and] many women simply fear invasive surgery . . . ." (*Id.*)

Planned Parenthood also offered the affidavits of nine women, some of whom had their scheduled medication abortion cancelled because of the Act. For example, one woman stated she was upset and sad because she felt a medical abortion was more natural, but she had scheduled a surgical abortion anyway. (Dawn Doe Aff., Page ID # 2574–75.) Another woman said that her daughter "wanted her abortion experience to be the least invasive possible, and wanted to have the abortion in the privacy of our home." (Leslie Doe Aff., Page ID # 2558.) When the medical abortion was cancelled, her daughter went forward with the surgical procedure on the scheduled day. (*Id.* at

Page ID # 2559.)  She added that her daughter was "nervous and scared [about the surgical procedure], and at the same time relieved that she was going to terminate the pregnancy."  (*Id.*)  Another woman said that she was "shocked by the news and scared" about the surgical procedure, but decided to go ahead with it on the scheduled day.  (Maria Doe Aff., Page ID # 2653.)  Another woman said she felt "very frustrated and exasperated with the situation" but "decided to go ahead with the surgical procedure that day."  (Doreen Doe Aff., Page ID # 2555.)

All of these statements give rise to the inference that some women prefer a medical abortion over a surgical abortion, but they do not support the conclusion that the unavailability of a medical abortion would create a *substantial obstacle* for a large fraction of women in deciding whether to have an abortion.  Indeed, as Judge Dlott pointed out, the evidence shows that all of the affected women who gave statements proceeded to obtain a surgical abortion regardless of their preference for a medical procedure.  Based on this record, we cannot assume that Planned Parenthood will produce different evidence at trial that could support this material fact.  Such an assumption would overstep the reasonable inferences we are meant to draw in the organization's favor. *See Matsushita*, 475 U.S. at 587.

I agree with the common-sense inference that because "the differences between the procedures from the perspective of the woman are substantial," some—maybe even most—women will prefer medical abortion over surgical abortion. *See ante* at ¶ 56. However, our consideration cannot end there.  The abortion right as it has been described by the Supreme Court protects the "freedom to decide whether to terminate" a pregnancy. *Casey*, 505 U.S. at 874.  The Court has not extended constitutional protection to a woman's preferred method, or her "decision concerning the method" of terminating a pregnancy. *Benten*, 505 U.S. at 1085 (Stevens, J., dissenting).  Therefore, without any evidence that the Act is a substantial obstacle to the ultimate abortion decision, our own common-sense conclusions about what women may prefer do not create a genuine dispute of material fact.

Accordingly, the district court properly granted summary judgment with regard to the method ban for women 50–63 days LMP.

**B. Increased Dosage**

The district court also properly found that Planned Parenthood failed to allege sufficient evidence to survive summary judgment on its claim that the added cost associated with increased dosage under the Act creates an undue burden.

Planned Parenthood alleges a "significant" increase in the cost of a medical abortion due to the increased dosage of mifepristone required by the Act. (Plaintiff's Resp. to Ohio's Prop. Undisputed Facts, Page ID # 2072.) More concretely, the organization submitted affidavits from clinic directors indicating an increase of $150. (*See, e.g.*, Harrington Aff. ¶ 8, Page ID # 2180; Brenner Aff. ¶ 9, Page ID # 2114.) Viewing the evidence submitted in the light most favorable to the organization, that would constitute an increase of more than 40% over what medical abortion currently costs. (*See* Harrington, Page ID # 2180.) Notably, before the Act, surgical abortion was offered at the same price as medical abortion in all of the clinics that submitted affidavits. (*See id* (both procedures currently cost $360); Brenner, Page ID # 2114 (both procedures currently cost $545); Clawson Aff. ¶ 12, Page ID # 2151 (both procedures currently cost $410); Lonn Aff. ¶ 9, Page ID # 2186 (both procedures currently cost $450)). So, unless the cost of surgical abortion is independently raised, the alleged increased cost of medical abortion would make surgical abortion a less-expensive option. Planned Parenthood also submitted the affidavit of a woman who stated: "If a medication abortion were offered at a price that was $100-$200 higher than a surgical abortion, it would be really difficult for me. I am not certain I would be able to still choose medication, though I would try to raise more money, because it would be worth a lot to me." (Emily Poe Aff., Page ID # 2565.)

Although the Supreme Court has indicated that "at some point, increased cost could become a substantial obstacle," *Casey*, 505 U.S. at 901, that "point" remains undefined. In *Casey*, the evidence showed only that a disputed recordkeeping requirement "might increase the cost of some abortions by a slight amount." *Id.* The

Court declined to find an undue burden. The *Casey* Court also considered an in-person informed-consent requirement and a twenty-four hour notification requirement. *Casey*, 505 U.S. at 884. These requirements caused women to make more trips to the clinic. The Court stated the facts on the record as follows:

> The findings of fact . . . indicate that because of the distances many women must travel to reach an abortion provider, the practical effect will often be a delay of much more than a day because the waiting period requires that a woman seeking an abortion make at least two visits to the doctor. [I]n many instances this will increase the exposure of women seeking abortions to "the harassment and hostility of anti-abortion protestors demonstrating outside a clinic." As a result, . . . for those women who have the fewest financial resources, those who must travel long distances, and those who have difficulty explaining their whereabouts to husbands, employers, or others, the 24-hour waiting period will be "particularly burdensome."

*Casey*, 505 U.S. at 885–86. Still, the Court found that even these onerous impediments did not constitute an undue burden based on the record.

In *Women's Med. Prof. Corp. v. Baird*, 438 F.3d 595 (6th Cir. 2006), this Court addressed the closure of a clinic, which required women to travel farther for an abortion—giving rise to increased cost. The increased travel distance caused by the disputed closing of a clinic in that case would require women to travel at least 55 miles to reach an abortion clinic. *Id.* at 605. After noting that the binding and persuasive authority did not "firmly establish when distance becomes an undue burden" this Court found no undue burden even though closing the clinic "may be burdensome" for some potential patients. *Id.* This Court reasoned that there was no undue burden because "there is no indication that the closing of the clinic would create a substantial obstacle for Dayton-area women seeking an abortion . . . ." *Id.* at 606.

Similarly here, Planned Parenthood has not placed on the record any evidence suggesting that the added cost of a medical abortion would unduly burden the right to choose abortion for a large fraction of affected women. Moreover, the evidence submitted by Planned Parenthood shows that surgical abortion remains available at a lower price. In fact, the only woman who mentioned the increased cost in her statement

specifically said that this would make it difficult for her to choose *medical* abortion, but not that it would be a burden on her choice to abort her pregnancy.  This evidence does not give rise to a reasonable inference that the dosage increase is a substantial obstacle to the choice to undergo abortion.

Even more than in the method-ban analysis, we cannot infer a substantial obstacle from the evidence submitted regarding the increased dosage requirement.  The record arguably supports an inference that the increased cost would burden women's ability to choose medical abortion, which may be their preferred method.  However, that does not permit a reasonable inference that an undue burden on the constitutionally protected "freedom to decide whether to terminate" a pregnancy would result.  *Casey*, 505 U.S. at 874.  That is because, even assuming the increased cost presents a substantial obstacle to choosing a medical abortion, women would still have the lower-priced option of surgical abortion available to them.  Without evidence that the cost increase would create a substantial obstacle to the ultimate choice to undergo an abortion, this claim cannot survive summary judgment.

Thus, the district court properly granted summary judgment on this claim as well.